Here ye, here ye, here ye. This Honorable Appellate Court for the 2nd Individual District is now open for suit to adjourn. The Honorable Susan F. Hutchinson will preside.  Your Honor, the case number is 2-417-1281. The people of the State of Illinois, the plaintiff's attorney, the remarks being made in the hallway are to the defendant's account. I remain on behalf of the defendant's office, Mr. Thomas A. Lillian. I remain on behalf of the plaintiff's attorney, Mr. James P. Jones. Mr. Lillian, good morning. Good morning. Mr. Bernhardt, good morning. And Mr. Lillian, I'm glad you could find the spot. You haven't been here in a while. That's true. That's true. People recite it right. Step in here. May it please the Court, Counsel, I'm here this morning on behalf of Mark Oelerich, who stands convicted and sentenced for first-degree murder and aggravated driving under the influence after a jury trial in Lake County. The sole issue in this case is whether the requisite mental state for that first-degree murder count was proved beyond a reasonable doubt. Was there ever any effort at the trial court level to raise fitness or sanity or anything to stand trial or to understand the elements? There was certainly not a proceeding on fitness to stand trial, Your Honor. The defense did retain a psychiatrist who testified on behalf of the defense, testified in detail about her diagnosis of schizophrenia on the defendant's part and the various symptoms and manifestations, his history in about an eight-month period before the collision in this case. So there was significant testimony about psychological – his psychological state and psychological disturbance, but no – it was not raised – reaching the point of insanity. So the state did not have to prove the defender was legally sane at the time of the offense, correct? That's correct. That's correct. Sanity was not an issue. That's why this is directed strictly at the mental state for the crime. The defendant charged with performing the acts that caused the death, knowing the acts created a strong probability of death or great bodily harm. If we look at the definition of knowing, there's really two prongs in that definition. The defendant acts knowingly as to the nature or intended circumstances of his conduct when he is consciously aware that his conduct is of such a nature or that such intended circumstances exist. The second form of knowledge is acting knowingly as to the result of conduct. The defendant acts knowingly when he is consciously aware that the result is practically certain to be caused by the conduct. Both forms of knowledge require conscious awareness on the part of the defendant. But where's the evidence that he wasn't consciously aware of exactly what he was doing? Didn't he talk about getting in the car and driving it and driving – There's – I think we need to separate the act from the mental state here. We are not contending that there was not a voluntary act on his part driving the car in this case. But, you know, the state cites the proposition that you intend the natural and probable consequences of your voluntary and willful actions. Willful is the same as knowing. They still have to prove the mental state of knowledge. And it's knowledge as to the consequences here particularly that we think is a question. And that was my question. Isn't there evidence here that he was aware of the consequences of driving this car into that car? I think he was aware of the consequence that he was going to crash and either, you know, the psychological evidence could be read a couple of different ways. There's points where he indicates he was being suicidal. There's other points where he's acting out of a sense of euphoria and invisibility, I would say. Right, but that's the point, that he realized that driving his car was to test whether or not he would die. Can't we infer from that that the person in the other car would face the same – This particular defendant in his disturbed mental state, it's our position that he was simply not thinking at all of the person or persons who might be in that other car. It's our position that in his disturbed mental state it was a totally self-centered perspective, a totally self-centered mental state looking at himself and what was going to happen to him, what he was trying to do. There's a point where he claimed that he was following the signs and they told him to crash the car. Mr. Willing, did the medical evidence establish that a person who is suffering from a schizophrenic episode loses all contact with reality? That wasn't the testimony, was it? But there was testimony that this could be a psychotic episode, that this could have been a psychotic episode. And in whatever the duration of that psychotic episode, yes, then there would be a loss of contact with reality. And certainly with schizophrenia, that's a common symptom. How do you decide between the – I'm sorry, I didn't mean to cut you off. Go ahead, finish your thought, I'm sorry. But with the diagnosis, and I would submit in this case, I don't think there can be any question that this defendant actually had mental disturbance. This was not just the consequence of the cannabis and whatever other substances he may have ingested. If you look at the videos in this case, there's the testimony from the psychologist about the history, the breakdown in his mental condition over an eight-month period where he'd become paranoid, extremely paranoid about a number of things. His family recognized it, his girlfriend recognized it, his mother was aware of it. Was that really in the speed of trial? Did the state attempt to persuade the jury that he wasn't suffering from schizophrenia? Well, the state has certainly taken that position on appeal, Your Honor, suggesting this was all a drug-induced episode and was not a result of the mental illness. And I would submit if you look at the videos of the man taking his clothes off in the jail cell, kicking at the walls, the officer says right before the interview he was on all fours on the floor, beating his head against the wall. He's clearly disturbed in the video interview, the longer video interview that you see. He's still not in good condition the next day when the second interview is conducted. This man legitimately had mental disturbance, mental problems. I think that's clear from the record, but I think what it comes down to is his belief that he was acting on a calling, you say, to test his immortality. I think we agree that that's what he was thinking. Well, there's other points where he says he wants to die. I think there's a couple of different, you know, how you quite jive the invincibility with the suicidal. Assuming that in the mental state, is that inconsistent with the recognition that he could cause great bodily harm or death to somebody else? I mean, he must know that in the process of testing his own immortality, in running his car down the road at that speed, he's likely to have an accident that could be fatal. Correct, but it could have been an accident where it was just him. But the point is he was simply... Wait a minute. It wouldn't have been an accident where it was just him because he chose to drive into another car as opposed to a tree, a cemented bridge, or whatever. That's correct. He drove into another car, not into a stationary object or something like that. But the point is he was looking... Again, with his mental disturbance, it was a totally self-centered perspective. He was looking at, this is what I'm going to do, this is what's going to happen to me. He was not consciously aware of what was going to happen to the people in the other car. Do you... Would you say it is his disturbance acting alone that causes your position, or is it a combination of the cannabis, alcohol, and disturbance? Well, I'm not sure there's any testimony that it's alcohol, Your Honor. There's cannabis... Was there alcohol in the car? Well, they talk about... At one point he says he ingested K2 synthetic cannabis. There's references to DMT, which is a hallucinogenic. But unfortunately, for whatever reason, the forensic scientists who tested the blood only testified for cannabis. Okay. Said by lab policy, even though she's told, hey, this person took K2, she doesn't test for it. So there's sort of... Well, there's something else in the system that would justify the aggravated DUI. So my question is, is it both the disturbance and whatever it was he ingested? Well, assuming... I don't think... It doesn't seem like this... The effects here would be from... There was testimony... At one point in the statement, he talks about smoking one or two joints, I think, of cannabis. I don't think that that amount of cannabis is going to explain this level of behavior. I think there had to be... I think it's primarily the mental disturbance, and there may have been an additional drug in there besides the cannabis making it worse. The only thing they had to test for for the aggravated DUI was the cannabis. They didn't need anything more than a trace of THC in his blood, and they had proved that element for the aggravated DUI charge. Unfortunately, the testimony from the forensic scientist does not go further into exactly what array of drugs, what drugs actually were in this man's system. Now, the defense position is that he would have been guilty or should have been found guilty of reckless homicide at the most, correct? Correct, but because of the aggravated DUI count as to the death, that's really a more serious offense than the reckless homicide, so that sort of trumps the reckless homicide. But the jury was instructed on reckless homicide. They could have found him guilty on that, right? The jury could have, yes. But then, presumably, the most serious sentence was going to be on the aggravated DUI count. In the interview, I thought it was the interview of that day, he was asked, you guess you did it on purpose or you did it on purpose? And he says, I did it on purpose.  Who did I kill? Don't tell me who I killed. This is all happening within a very short period of time. So how, if he recognizes that he killed somebody, he doesn't want to know who, but he recognizes it and he admits he did it on purpose, how does that impact his theory that it's a psychotic episode? Well, the psychotic episode could have had a limited time, and this is some period of time later before he's back at the jail and undergoing the interview. But he's now, he's also naked back at the jail and he's hitting his head on the wall. How long does this psychotic episode last? Well, I mean, he's clearly, in the aftermath of what happened, he becomes very distraught. He's sobbing, he goes through taking off his clothes, talking about how terrible it is, how he's had, you know, demons told him what to do, problems with God. And actually the first thing, with respect to another person, is he simply asks, he doesn't know anybody's killer, it's not, who did I kill? The first question is just, you know, did I hurt someone? And then they say, you know, did I, you know, inquire, and then they tell him, well, we don't know yet how severe it is. But yes, there's certainly some remorse afterwards. He certainly reaches a point where he realizes, oh my God, what did I do? But that doesn't mean that at the moment of the crash, and I think one of the other things that's indicative of more of his mindset at the moment of the crash, the first thing we hear from him is the OnStar recording. And in that OnStar recording where he says I was on the DMT trip of my life and does say I went head-on into another car, he also says to the OnStar person, well, no one was injured. So his perspective on it, again, is totally on himself. But isn't that his perspective after the fact? Well, it's very, very, very closely after the fact because the collision sets off the OnStar system in the car. So the first person who talks to him is the OnStar person, and he says no one injured. Again, he's not thinking in terms of the person in the other car. He's not showing a conscious awareness of the effect of his conduct on the person in the other car. I mean, that could be a very simple fact that since his airbag deployed, he couldn't see anything else because when the officer arrives, all he can see is a hand behind the airbag. So we don't even know if he can see another car. He just knows he wasn't injured, so he can say no one was injured. Well, he knows. I mean, he knows at that point he's hit another car. If you accept that he committed a voluntary act, he doesn't say he hit another car. He said he drove head-on into another car in that OnStar statement. Yes, he does. So he knows he's hit another car. And, again, his perspective is totally on himself. This is not somebody who is consciously, unfortunately, not consciously aware of what the consequences of his conduct were going to be for another person. I think that pretty much. Counsel, if I fire a gun at you just to see if it will work, just, you know, I just want to see if the gun works, and I'm a lousy shot and I miss you and I go, you know, no one injured, does that negate the fact that I pointed a gun at you and pulled the trigger? No, it doesn't negate your act. But, again, that's the act. And my intent to fire the gun at you to see if it works. Okay. It sort of seems like this is a sliding scale. Again, there's two components to that. There's the intent to fire the gun. There's a mental state as to the act, but there's also a mental state as to the consequences. And when I fire it directly at you at 10 feet away, doesn't that create a strong probability that the bullet is going to hit you? Absolutely, Your Honor. Now, I'm going to presume, Your Honor, it's hypothetical, Your Honor, is in a semi-irrational state of mind in contact with me. Even if I'm not. Even if I'm just in a disturbed state of mind, but I can say immediately after or within an hour, yeah, I intended to fire the bullet right at that guy. But it's the right at that guy. That's the mental state. And the guy is close to a car. You know, I mean, but obviously if a car is moving, there's probably somebody driving it. Yes. And so does it matter if he were driving at a pedestrian versus drove right at a car? Well, yes, I think a pedestrian makes a difference. And, in fact, the only case the state has cited is a pedestrian case. The cases we pointed out in the briefs where somebody was found guilty of murder for using a vehicle to cause the death and a murder conviction was upheld are hitting pedestrians. That's where the case law is in this area, not hitting the car. I mean, hitting a pedestrian without any protection around that pedestrian, certainly to me and to you says there's going to be a problem. But if a person is in a psychotic episode, how is that person going to know that? Right. The cases out there that uphold murder convictions don't have somebody with this kind of mental condition. The mental condition is what really puts this on the other side of the line for the collision, whether it's a person, a car, or otherwise. What you're saying reduces simplest terms. When he was driving his car at a very high rate of speed to test his immortality, as it were, he knew what physical act he was committing, but he was not conscious, you're saying, that it was going to create a strong probability of a great deal of harm to someone else. Does that be just what you're saying? Absolutely, Your Honor. Then I know you weren't there, but why wasn't insanity or sanity raised? You weren't there. That's a good answer. I don't know what the psychiatrist was asked to do if the psychiatrist was able to offer an opinion on that. It's not in the record. Doesn't the court have an obligation, though, to raise that if he or she sees something that would indicate that there is an instability? Certainly. And I'm sure that there were court appearances where, although he had his clothes on, he may have said things that might not have been appropriate. Right. I mean, a lot of times a defendant may sit silent and let his lawyer do the talking. This was not a defendant who acted up in any way in court in front of the judge, which helps explain why this never reached the point of a fitness hearing. For all those reasons, we'd ask that Your Honor is to reduce this to the conviction for aggravated driving under the influence. Thank you. Mr. Kornar. Good morning, Your Honors. I guess first off, I just want to listen to the argument. The defendant is trying to, I think, make a distinction between malice and intent, like the defendant had to have malice against these other people to have intent. And I don't think that's required under the law. It's clear if we look at the actual act and its natural tendency, him going very into a car where the victim actually tried to avoid him, driving over 70 miles an hour without braking. I was going to use the same example, Your Honor. I think it's the same as just firing a gun at someone. You don't have to know who that person is, but you have that intent. But you have to know that your act creates a strong probability of death or great bodily harm to somebody. There is two elements that must concur. There's the physical act and there's the mental act, correct? Correct. And when you veer into a car going 70 miles an hour and you don't brake, there's your intent to cause that act. Well, he was, according to his own report, he was testing his own immortality, invincibility. Is there any indication that he would know in testing his own state of being that he might be impacting another state of being? Well, certainly in all the comments after, in the videos, at least twice he said, yes, I steered into their car purposely. He knew at that time he did it on purpose. He also made the statement, when I get angry, I lose my mind. Here's a guy, he had a sufficient mental state. Here's a person who came in to the house, talked to his dad, took his mom's keys and went out into this SUV and drove it. Obviously he was, I don't think it was so much schizophrenia or some kind of mental illness as the fact that it was a reaction to taking multiple psychedelics. You take DMT, psychedelic mushrooms, cannabis. But he later denied that. The only thing we have evidence of is the cannabis. Well, we have evidence of that, and also I think there was testimony by the expert who was testing that psychedelic drugs, by the time it was tested, you can't find that in the blood or the urine. So you can't really test for that. He certainly acted like it, his own expert said. How do we know the difference between what was precipitated hypothetically by some drug that we never tested for versus he was in the throes of a schizophrenic breakdown? Well, you look, schizophrenia, the experts in the DSM says you have to show these symptoms for over six months, at least one symptom. He didn't show any of his symptoms. Is the state disputing that he was in the midst of a psychotic episode when the accident happened? Are you disputing that? I'm saying I have some doubt, yes. What did Dr. Rowe testify? Didn't she testify that he was in the middle of a psychotic episode? Well, that was the defendant's expert. Well, what contraindications was it? Well, the fact that she was on cross-examination, she said when they're taking multiple drugs, we can't really diagnose schizophrenia. Those drugs can cause the same symptoms as schizophrenia. Also, the defendant's mother said he's never had any psychological problems. He told one of the police officers. She talked to the defendant's girlfriend. Well, they had a baby together. She might have, and she was never subject to cross-examination. She had some motive to maybe not tell the truth. And she was basing her expert opinion on those things, and that was brought out on her cross-examination. And she specifically said, I cannot make a diagnosis when they're on drugs, psychedelic drugs. It's the same symptoms. He did not show one symptom. They did not show one symptom he had in that six months prior. What about that? That had been tested on cross-examination. What about the paranoid thinking? Isn't that one of the symptoms of schizophrenia? Well, it certainly is, but certainly taking DMT and psychedelic mushrooms can give you paranoid thinking also. Tell us succinctly what establishes that he knew that the time that he ran into the other car, his ax created a strong probability, other than the fact that he knew he was driving it. What evidence bears on proving the aneurysm without the mental state necessary? The fact that he went into the other lane and went into a victim's car where she was trying to avoid his car, the fact that he did not brake, and the fact that he was going over 70 miles an hour. But that all goes to the act. Right. Where is the intent? You get the intent from the surrounding circumstances. Which would be? Which would be? Separate from the act. We've established the act. Well, I already mentioned he had, well, he was at lunch with his brother. They didn't bring any information in that there was any problem with his brother. His brother wasn't saying he was acting psychotic. They didn't bring his father and say he was acting psychotic before he left in the car. He snuck off with the keys. I guess he wasn't. Those weren't his keys for that car. The fact that he talked to his father and they had a conversation, there was no evidence rebut or to say that he was speaking, you know, or not making sense to his father. There was none of that evidence before he left in that car. He had that mental state. Well, you're inferring it, obviously, because as we know. Well, that's the only way we can, Your Honor. Exactly. We can only infer it. Exactly. But I think that's strong evidence. When you look before, he drives home from his brother's. He goes into the house. He talks to his father. Takes the keys and goes out again. But can't we also infer that immediately after the accident, his behavior is unusual to say the least? Okay. Here's the event, the act. There's no dispute about the act. And you're suggesting prior to it, look at the absence of all these things. But subsequent to it, we have the presence of a myriad of symptoms and behaviors, whatever you want to call it. So why isn't the inference the other way? Well, one, I don't know how a person acts when they're overcome by overwhelming remorse, guilt of what they did. Two, I don't know if there's any lingering going on. You know, those symptoms can be a number of things. You know, is he trying? He knows he's in trouble. But I think, you know, from the record in the video, certainly there is overwhelming guilt there. But my question remains, and I asked Mr. Lillian, I want to ask you, Dr. Rome did not, to my recollection, testify to the length of this psychotic event. But are we ñ I mean, is the idea that the psychotic event occurred at the time of the accident or did it continue? Because if it continued when he said, I did it on purpose, are we to discount that? You know, why did they ask him the question and why did he say, I did it on purpose, if he was, if the act was still going on, if the event was still going on? I mean, I just don't know how long the psychotic event lasted. Was it until he got thrown onto the ground and he was fighting with the officers? Was it into his detainment? How long did it go on? Well, he was in an accident, a head-on accident. I think there's a good possibility that the occurrence of having a head-on accident and there was blood found in the car, that his blood could be excluded from the car, that maybe this started at the time after the accident because you can certainly, you know. Or did he get immediately better after the accident? I mean, that's, we've got your evidence before where he seemed to be normal or regular to his family and then we have what appears to be great remorse and admitting, I did this on purpose. Why did he go out in the SUV, take the keys, which he wasn't supposed to, sneak out? He certainly had an intent. Well, he could have taken his own car, but I suppose if he was immortal, he wanted to come back to a car. I mean, that, you know, why did he take the SUV? Because it was bigger? I don't know what his car was. I mean, there are lots of questions that don't answer. Maybe he was angry. Maybe, you know, he was, you know, dealing with a psychotic event. Maybe these things kicked in somewhere on the drive or, you know. It's a difficult case, Your Honor, as I understand. But certainly we have, you know, the inferences are strong. The jury, you know, 12 people decided that they can infer this, that what happened was sufficient to find this defendant guilty of murder. And I don't think, especially, you know, in the light most favorable of prosecution, I just don't know, you know, that this other evidence would be enough. Like I said, you know, there's overwhelming remorse here, obviously, you know. But he has a conscience. That's a good thing. But he certainly knew what he was doing, and he had that intent. And the only thing we don't know what was in his mind exactly, but certainly from those surrounding circumstances. Excuse me for a second. I just want to make sure I covered everything. Yeah, and just the last thing, you know, the audio of the on-star. You know, he stated I ran head on into somebody. He certainly had the presence of mind at that time, too. But then he followed that with no one was hurt or everyone is okay. Where does that come from? If we're saying that this is, he understands what he did or intended what he did. Well, because of the drugs, the fact that, like you stated, he doesn't know. He just been around. I don't know. I don't remember the video if he was even facing the car, because I think his car did almost a 360. So he may be looking out the window the other way. But certainly, you know, he was under the influence, and he was just, like I said, a major head-on accident. It's hard to say. It's difficult to say. Is there any other questions, Jan? No. Thank you. Thank you. Mr. Lillian. Just two basic points, Your Honors. First of all, this record does establish that the symptoms lasted for over six months. What the girlfriend told the psychologist was that they started in March of 2012. That's eight months before the accident. We have the necessary duration for the diagnosis of schizophrenia based on the paranoia. Well, his conduct, his changed conduct lasted for six months. And the fact that he tore up insurance, didn't want his child to have a birth certificate so the Army couldn't find him, those types of things, that's paranoia. Is that a recognized? That's one of the indicators for the schizophrenia, yes. Did he exhibit any others? Well, I think there's a persecutory element to those, which is also an element. Depression and anxiety, he says that he was depressed and super depressed and anxious in the course of the statements. He was taken, according to what his mother told Dr. Brown, taken for a psychological evaluation in April of 2012. That's when he tears up the insurance. He doesn't go through with the treatment, but something's obviously wrong at that point. He acts paranoid even in response to having gone for the psychological evaluation back then. So there is a duration to the symptomology here in this case. The other point I would make is the psychotic episode, I don't know what the total duration of it was, Your Honor, but it had to have started before the accident. And, again, that's where the very nature of the act. Okay, it's a voluntary act, but what's motivating him? Let me ask you this. The act is not an issue, but it's the mental state at the time when he decides to drive into another vehicle. And it appears, from your perspective, from the defendant's viewpoint, he is testing his immortality. I want to know if this will kill me. And he chooses to drive into a vehicle to see if it will kill him. Isn't that inherently acknowledging that if I do this act, there is a strong probability of death? A strong probability of what? If that's what he picks. To himself. Right. But it is, whether or not, at the time he hits another vehicle, does he believe that that act can create a strong probability of death? He has to be consciously aware that it's got a strong probability of death of great bodily harm to another, not himself. I know, but my point to you is, isn't that the strongest piece of evidence? That he did understand that this act, the connection between this act and a strong probability of death. We are, I mean, something we don't know is, you know, we talked before, you said before, an abutment or into a tree. Right. We don't know if that was just a spur of the moment when he decided, you know, part of the psychotic episode, that he decided to drive into another car as opposed to something else. He's just out for this drive at a high rate of speed, this aura of invincibility, maybe wanting to kill himself. Yes, he also rejuvenates. You just said, we don't know. Isn't this a defense? Isn't this some evidence that the defendant would have to come forward with? I think it's there in all the, you know, the testimony, the evidence from the statements, particularly the videotapes afterwards showing his condition, and what he says about what was going through his mind when he drove it. The defense, he does talk about what's in his mind going into it, and if it's the statements about invincibility, I want to kill myself, either one. Totally self-centered, egocentric perspective, not at all consciously aware of what's going to happen to somebody in that other car. But Dr. Rome does testify after all of the testing that went on by the psychologist that even in a serious case of schizophrenia in an event, the person does not usually lose all contact with reality. And, I mean, death is a pretty strong reality. I mean, someone with schizophrenia does not necessarily mean they're always out of contact with reality, but she, Dr. Rome, does refer to a psychotic episode, and that fits, that's the thing that best fits the scenario that occurred here. But does it go on, is it just the accident? Just before the accident? Does he, does it occur after the accident? I don't know the exact end point. Certainly it seems to be continuing through the point where he walks away from the screen, seems to be walking to Italy, fights with superhuman strength, according to the officers. And Rome testified that that's evidence of a psychotic episode of superhuman strength, right? Correct. It could also be evidence of psychedelic medications or something. Right, but I think, I'd say there the burden was on the state to do that testing. I mean, the state had the burden of proof of the mental state. The defense offered the best explanation for what was going on here. What's the standard of review here? It's the reasonable doubt standard of review. Rational trier effect. Rational trier effect. But we would say a rational trier effect could not reject the evidence of a schizophrenia, the defense evidence in this particular case. Thank you. Thank you, Governor. Thank you, counsel, for your arguments today. And to those here in attendance, we will take this matter under advisement and render a decision in due course. We will stand in recess for a short time to prepare for the next case.